UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES HICKS #134423,

    Plaintiff,                                              Hon. Hala Y. Jarbou

v.                                                                  Case No. 1:19-cv-6

BRAD HAYNIE, et al.,

    Defendants.
_____/

**REPORT AND RECOMMENDATION**

Plaintiff James Hicks, who was incarcerated with the Michigan Department of Corrections (MDOC) at the time he filed his complaint in this action pursuant to 28 U.S.C. § 1983, alleges that Defendants violated his rights under the Eighth Amendment by failing to protect him from harm at the hands of other prisoners and violated his rights under the First Amendment by retaliating against him. Following several stipulated dismissals, the remaining Defendants are Mary Berghuis, the former warden at Brooks Correctional Facility; Sherry Burt, the current warden at Muskegon Correctional Facility; John Davids, the former deputy warden at Bellamy Creek Correctional Facility; Brad Haynie, a former MDOC classification specialist; and Bernard Scott, a former MDOC classification specialist. Plaintiff alleges that Defendants Berghuis, Burt, Haynie and Scott failed to protect him and that Defendant Davids retaliated against him.

Presently before the Court is Defendants' Motion for Summary Judgment (ECF No. 114), in which they argue that most of Plaintiff's claims are subject to dismissal without prejudice for lack exhaustion and that they are entitled to summary judgment on all claims on the merits. Pursuant to 28 U.S.C. § 636(b)(1)(B), I recommend that the motion be **GRANTED**.

1

## I. Background

In 1985, Plaintiff began serving a 50 to 100-year sentence following a conviction for assault with intent to rob while armed. (ECF No. 244–45.) Over the following years, Plaintiff regularly acted as an informant from within MDOC facilities to various law enforcement agencies, including the Drug Enforcement Agency, the Federal Bureau of Investigation, and the Michigan State Police, as well as to the MDOC, providing information on numerous matters that was used to investigate and prosecute both prisoners and MDOC employees. (ECF No. 1 at PageID.5–6; ECF Nos. 116-2–116-4.) Because of this activity, Plaintiff's safety and life was at risk from prisoners and corrections officers seeking to retaliate against him. (ECF No. 116-2 at PageID.527.)

As relevant to this case, Plaintiff assisted the Flint Township Police and the Michigan State Police in securing a conviction against a prisoner for the murder of an MDOC employee. In 2006, Plaintiff was incarcerated at the Muskegon Correctional Facility (MCF) and shared a cell with Tajuan Williams. During this time, Williams confessed to Plaintiff that, while out of prison, he had murdered an MDOC employee with whom he was in a relationship. (ECF No. 116-8 at PageID.562–63.) Plaintiff reached out to law enforcement and was put in contact with officers of Flint Township, where the murder occurred. Plaintiff recorded Williams's confession and testified against him at trial, which resulted in a conviction. (*Id.* at PageID.564–65.)

In December of 2013, Plaintiff was transferred from the Thumb Correctional Facility to Brooks Correctional Facility (LRF). (ECF No. 115-3; ECF No. 116-8 at PageID.578.) Plaintiff was concerned about his placement at LRF because he had recognized several prisoners there who had been housed at MCF when Plaintiff was there in 2006 and thus would have known about Plaintiff's testimony against Williams. (*Id.* at PageID.578–79.) In addition, because MCF was located adjacent to LRF, and prisoners were frequently transferred between those facilities,

2

prisoners at one facility often knew what was happening at the other facility. (ECF No. 116-6.) Upon his arrival at LRF, Plaintiff spoke with Defendant Berghuis and told her that he should not be at LRF because there were prisoners there who had seen Plaintiff and had commented that he was the prisoner who testified against his cellmate at MCF. (*Id.* at PageID.580–81.) Berghuis could tell that Plaintiff was "uneasy" and "uncomfortable" (ECF No. 116-9 at PageID.601–02), but she did not take any direct action to address his concerns, such as placing him in protective custody, transferring any of the prisoners Plaintiff had identified to a different facility, contacting central administration or the regional office, or transferring Plaintiff to a different facility. (*Id.* at PageID.604–07.) Although Berghuis claims that she asked Inspector Brian Evans to watch Plaintiff and make sure that he was okay (*id.* at PageID.599–600, 603), Evans does not recall Berghuis speaking to him about Plaintiff, and he confirmed that he did not investigate whether a prisoner needed protection due to his cooperation with law enforcement (ECF No. 116-11 at PageID.625). According to Plaintiff, Berghuis said that they would "get to the bottom of it," but she wanted Plaintiff to work with Evans investigating bad officers at the facility. (ECF No. 116-8 at PageID.582.)

During his time at LRF, Plaintiff sent written requests to be transferred to Berghuis and others at the facility. (ECF No. 115-2 at PageID.255–56.) In addition, individuals outside the facility acting on behalf of Plaintiff, including an attorney, spoke to Berghuis and Defendant Haynie regarding Plaintiff's concern that he may be attacked at LRF. (ECF No. 116-18 at PageID.676–77; ECF No. 116-14 at PageID.653–55.) However, no action was taken to transfer Plaintiff to a different facility. Berghuis retired from the MDOC on October 1, 2015. (ECF No. 115-4 at PageID.263.) On January 8, 2016, Plaintiff was attacked by two prisoners who stabbed him multiple times. Following the attack, Plaintiff was transferred to Duane Waters Hospital,

3

where he remained until February 11, 2016. Plaintiff was then returned to LRF and placed in temporary segregation.

On March 1, 2016, on Defendant Scott's approval, Plaintiff was transferred to MCF and initially placed in the general population. (ECF No. 116-10 at PageID.683.) Upon arrival, Plaintiff spoke to Inspector Glen Jenkins. Plaintiff explained what had occurred at LRF, including his history at MCF. Plaintiff also told Jenkins that he was being assigned to room with a prisoner who was involved in the plot to hurt him at LRF. Jenkins called Defendant Burt on speaker phone to inform her of the situation and that Plaintiff was requesting a transfer. However, Burt, who was familiar with Plaintiff from her time at Ryan Correctional Facility, where Plaintiff had been also been stabbed, told Jenkins to "deal with it." (ECF No. 116-8 at PageID.586.) Plaintiff spoke up and told Burt about the situation, but Burt asked why Plaintiff would be transferred to MCF if Plaintiff's story was true. (ECF No. 116-20.) After the call, Jenkins told Plaintiff that they would not transfer him but would put him in a different cell. Ultimately, though, Plaintiff was put in the same cell as the prisoner he recognized as being involved in the hit at LRF. (ECF No. 116-8 at PageID.586.) The next day, Plaintiff was attacked by two prisoners who stabbed him in the head with knives. Following the attack, Plaintiff placed in segregation for his own protection.

On March 17, 2016, Plaintiff was transferred to the general population at IBC, a security level II placement. (ECF No. 115-3.) Following a security classification review, Defendant Davids placed Plaintiff in a special housing unit (SHU), which is used to house prisoners who need to be segregated from the general population for their own protection. Prisoners housed in the SHU have substantially fewer privileges than general population prisoners and are locked down in their cells for twenty-three hours per day. (ECF No. 116-8 at PageID.569–75.) Plaintiff remained in the SHU until January 3, 2017, after Plaintiff convinced Davids to return him to the general population.

(ECF No. 115-14 at PageID.475.) On July 18, 2017, a Grand Rapids television station ran a story about Plaintiff's history as an informant, including his attempts to obtain a commutation. On July 19, 2017, Davids transferred Plaintiff to temporary segregation and then, on July 21, 2017, back to the SHU, where Plaintiff remained housed for the duration of his time at IBC.

In December 2018, then-Michigan Governor Rick Snyder commuted Plaintiff's sentence. Plaintiff was subsequently granted parole and was released from IBC on March 28, 2019.

## II. Summary Judgment Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Material facts are facts that are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

While a moving party without the burden of proof need only show that the opponent cannot sustain his burden at trial, a moving party with the burden of proof faces a "substantially higher hurdle." *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002). Where the moving party has the burden, "his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986). The Sixth Circuit has emphasized that the party with the burden of proof "must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so

5

powerful that no reasonable jury would be free to disbelieve it." *Arnett*, 281 F.3d at 561 (quoting *Cockrel v. Shelby Cty. Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001)). Accordingly, summary judgment in favor of the party with the burden of persuasion "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

### III. Discussion

#### A. Failure to Exhaust

Defendants Berghuis, Burt, Haynie, and Scott argue that they are entitled to summary judgment based on Plaintiff's failure to exhaust his Eighth Amendment claims against them. Defendant Davids argues that he is entitled to summary judgment on the portion of Plaintiff's retaliation claim based on his second placement in the SHU, from July 21, 2017, until his release on March 28, 2019, based on Plaintiff's failure to exhaust that part of his claim.[1]

Pursuant to 42 U.S.C. § 1997e(a), a prisoner must exhaust all available administrative remedies before filing a lawsuit with respect to prison conditions under 42 U.S.C. § 1983. *See Porter v. Nussle*, 534 U.S. 516, 524 (2002). Prisoners are no longer required to demonstrate exhaustion in their complaints. *See Jones v. Bock*, 549 U.S. 199, 216 (2007). Instead, failure to exhaust administrative remedies is "an affirmative defense under the PLRA," which the defendant bears the burden of establishing. *Id*. With respect to what constitutes proper exhaustion, the Supreme Court has stated that "the PLRA exhaustion requirement requires proper exhaustion," defined as "compliance with an agency's deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 90-93 (2006). In *Bock*, the Court reiterated:

---

[1] Later in their brief, Defendants indicate that the retaliation claim from March 18, 2016, to January 3, 2017 (Plaintiff's first time in the SHU) is unexhausted. (ECF No. 115 at PageID.237.) It appears that counsel's later statement was in error, as Plaintiff exhausted his retaliation claim based on his first placement in the SHU.

> Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to "properly exhaust." The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion.

*Bock*, 549 U.S. at 218.

MDOC Policy Directive 03.02.130 sets forth the applicable grievance procedure for prisoners in MDOC custody. Prior to submitting a grievance, a prisoner is required to "attempt to resolve the issue with the staff member involved within two business days after becoming aware of a grievable issue, unless prevented by circumstances beyond his/her control or if the issue falls within the jurisdiction of the Internal Affairs Division in Operations Support Administration." Mich. Dep't of Corr. Policy Directive 03.02.130 ¶ P. If this attempt is unsuccessful (or is inapplicable), the prisoner may submit a Step I grievance. *Id.* The Step I grievance must be submitted within five business days after attempting to resolve the matter with staff. *Id.* at ¶ V. The issues asserted in a grievance "should be stated briefly but concisely," and the "[d]ates, times, places, and names of all those involved in the issue being grieved are to be included." *Id.* at ¶ R.

If the prisoner is dissatisfied with the Step I response, or does not receive a timely response, he may appeal to Step II within ten business days of the response, or if no response was received, within ten business days after the response was due. *Id.* at ¶ BB. If the prisoner is dissatisfied with the Step II response, or does not receive a timely Step II response, he may appeal the matter to Step III. *Id.* at ¶ FF. The Step III grievance must be submitted within ten business days after receiving the Step II response, or if no Step II response was received, within ten business days after the date the Step II response was due. *Id.*

Because Plaintiff was incarcerated when he filed his complaint, in accordance with the PLRA, he was subject to the MDOC's exhaustion requirements. *See Cox v. Mayer*, 332 F.3d 422, 425, 427 (6th Cir. 2003) (holding that the exhaustion requirement barred a former prisoner's claim

7

where the plaintiff filed his complaint without exhausting his administrative remedies and had since been released from custody). In support of their failure-to-exhaust argument, Defendants submit an affidavit from Richard Russell, the Hearings Administrator and Grievance Section Manager of the MDOC's Office of Legal Affairs. (ECF No. 115-7.) Russell states that Plaintiff's Step III Grievance Report shows that from January 1, 2013, to June 20, 2020, Plaintiff exhausted three grievances through Step III and that all three grievances concerned events that occurred at IBC.[2] (*Id.* at PageID.350.) Only one of those grievances, Grievance IBC-16-04-0803-21C (the 0803 Grievance), which concerned Plaintiff's first placement in the SHU at IBC, is pertinent to this case.

Plaintiff does not dispute that he failed to exhaust his failure-to-protect claims or his retaliation claim based on his second placement in protective custody at IBC. He argues, however, that he was not required to exhaust his claims because the MDOC's grievance policy provides no administrative remedy for facility and/or unit/cell assignments. In other words, Plaintiff contends that because the crux of his claims is his opposition to his transfers/assignments at LRF and MCF— a complaint for which the grievance procedure provides no administrative remedy—he was not required to exhaust his claims through the MDOC's grievance procedure. Plaintiff supports his argument with Russell's deposition testimony that the MDOC's grievance procedure provides no remedy to a prisoner who opposes his facility or unit assignment. (ECF No. 116 at PageID.506–07.) Russell explained that although prisoners "can make a request on anything[,] . . . placement . . . always comes down to the decision of the warden and the Security Classification Committee in

---

[2] The Russell affidavit indicated that the Step III Report was attached to the affidavit, but it appears that counsel failed attach it before filing Defendants' motion. In their reply, however, Defendants acknowledged counsel's error and attached both the Step III Report and Plaintiff's grievances as an exhibit. (ECF No. 119 at PageID.771 n.2; ECF No. 119-2.)

terms of where the appropriate placement of that prisoner is, and that's all within the jurisdiction of the warden and the warden's superiors." (ECF No. 116-27.) Plaintiff also notes that Berghuis confirmed Russell's view that MDOC policy does not permit a prisoner to grieve his facility assignment. (ECF No. 116-9 at PageID.598.) Plaintiff further argues that, given Russell's and Berghuis's testimony, even if the grievance procedure could provide some limited relief to a prisoner who objects to a facility or unit assignment, the exhaustion procedure is so opaque as to the availability of a remedy that, as a practical matter, the administrative procedure was unavailable to Plaintiff.

Plaintiff's argument fails, both factually and legally. First, the Supreme Court has made clear that whether a grievance procedure is available turns on whether it is "'capable of use' to obtain 'some relief for the action complained of.'" *Ross v. Blake*, __ U.S. __, 136 S. Ct. 1850, 1859 (2016) (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001)). A prisoner must exhaust his administrative remedies "even where the relief sought . . . cannot be granted by the administrative process." *Woodford*, 548 U.S. at 85 (citing *Booth*, 532 U.S. at 734). "[S]o long as the prison system has an administrative process that will review a prisoner's complaint, even when the prisoner seeks monetary damages, the prisoner must exhaust his prison remedies." *Hartsfield v. Vidor*, 199 F.3d 305, 308 (6th Cir. 1999) (citing *Wyatt v. Leonard*, 193 F.3d 876, 878 (6th Cir. 1999)); *see also Massey v. Helman*, 196 F.3d 727, 733 (7th Cir. 1999) (stating that "the PLRA does not condition the applicability of the exhaustion requirement on the effectiveness of the administrative remedy available in a given case"). Thus, a grievance process is "available" to a prisoner if the prisoner had access to the grievance process and the prisoner was capable of filing a grievance. *Braswell v. Corrections Corp. of Am.*, 419 F. App'x 622, 625 (6th Cir. 2011) (citing *Brown v. Baloff*, 422 F.3d 926, 936–37 (9th Cir. 2005)). Finally, a claim of futility will not excuse exhaustion under the

PLRA. *See Hix v. Tennessee Dep't of Corr.*, 196 F. App'x 350, 354 (6th Cir. 2006) ("There is no futility to the exhaustion requirement") (citing *Booth*, 532 U.S. at 741 n.6); *Jones v. Douglas*, 108 F. App'x 254, 256 (6th Cir. 2004) (noting that "[f]utile claims include those claims where there is an inadequate administrative remedy" and that "under *Booth*, even futile claims must be exhausted . . . before filing a § 1983 complaint").

With these principles in mind, it is clear that the MDOC's grievance process provided Plaintiff an avenue for relief. The policy directive provides as follows:

> Grievances may be submitted regarding alleged violations of policy or procedure or unsatisfactory conditions of confinement which directly affect the grievant, including alleged violations of this policy and related procedures. Grievances also may be filed in accordance with OP 03.02.130-A "State Administrative Board Prisoner Property Reimbursement" if the grievant is seeking reimbursement for property lost or destroyed while in the Department's sole possession.

Mich. Dep't of Corr. Policy Directive 03.02.130 ¶ E. Nothing in the MDOC's grievance policy categorically excludes facility or cell assignments from the grievance procedure or identifies them as non-grievable issues.

Plaintiff's issue was not simply that he was unhappy with his facility assignment at LRF or MCF, but that his placement at those facilities created a substantial risk to his safety because prisoners housed at those facilities were aware of Plaintiff's informant activity during his previous stint at MCF and had specifically identified him as the prisoner who had testified against his cellmate. His complaint—Defendants' failure to protect him—encompassed both policy violations and unsatisfactory conditions of confinement. For example, transferring Plaintiff into an environment that arguably put his life at risk and refusing to transfer him to a less-risky facility or, at a minimum, failing to place him in protective custody, would have violated MDOC Policy Directive 03.03.130 ¶ K., which obligates staff "to protect the lives of both employees and prisoners." In this regard, Russell confirmed that the grievance door is open to prisoner complaints

10

alleging that a facility or unit placement violated policy or created an unconstitutional condition of confinement: "There would have to be - - they would have to have a good argument for wanting to get moved. And, you know, prisoners, on occasion, do get moved if they have a good reason." (ECF No. 116-27.) Consistent with Russell's testimony, Plaintiff conceded that he could have grieved a failure to protect. (ECF No. 115-2 at PageID.258.) Moreover, Plaintiff's own grievance activity demonstrates that the procedure was available to Plaintiff. Although it was ultimately denied, Plaintiff pursued the 0803 Grievance—which complained about his placement in protective custody at IBC—through all three levels of the grievance process and was never advised that his grievance concerned a non-grievable issue or that no remedy was available. In fact, the Step I response indicated that future relief, which Plaintiff eventually obtained, was not foreclosed, stating that "SCC will continue to monitor and review prisoner's placement as required by policy and sound correctional judgment." (ECF No. 119-2 at PageID.798.)

Acceptance of Plaintiff's argument would exempt a wide swath of prisoner claims from the MDOC's grievance policy. That is because the bulk of failure-to-protect claims involve a defendant's failure or refusal to alter the plaintiff's cell or facility assignment to eliminate or reduce a danger posed by threats from other prisoners. However, Plaintiff cites no case that even suggests that a failure-to-protect claim based a defendant's failure to change the plaintiff's cell/facility assignment need not be exhausted. In fact, courts have routinely found that facility-based claims asserting a variety of violations are subject to the exhaustion requirement. *See Burley v. Leslie*, No. 1:13-cv-599, 2014 WL 4660199, at *5 (W.D. Mich. Sept. 17, 2014) (plaintiff's claim that the defendant refused to arrange for the plaintiff to be transferred to another facility with Jewish services dismissed for lack of exhaustion); *Price v. Palmer*, No. 1:09-cv-172, 2009 WL 5219727, at *1, 4 (W.D. Mich. Dec. 31, 2009) (concluding that plaintiff failed to exhaust his claim that the

11

defendants denied him a transfer to another facility that could accommodate his medical condition); *Jones v. Caruso*, No. 1:07-cv-786, 2008 WL 4534085, at *2, 6–8 (W.D. Mich. Sept. 2, 2008) (the plaintiff's claims that the defendants were deliberately indifferent to his serious medical need by placing him in units with smokers and retaliated against him by transferring him to a facility without smoke-free housing were subject to exhaustion), *report and recommendation adopted in part and rejected in part*, 2008 WL 4534081 (W.D. Mich. Sept. 29, 2008).

One other point merits some discussion. Plaintiff asserts in his brief that he was told by prison staff that he could not grieve transfers. (ECF No. 116 at PageID.508.) Plaintiff's actual testimony was that he filed a Step I grievance in 2015 while at MCF about being transferred. (ECF No. 116-8 at PageID.566–67.) Although apparently mistaken about the year, Plaintiff testified that the grievance, about not being transferred, was rejected as non-grievable. (*Id.* at PageID.567.) Apart from his testimony, he provides neither the grievance nor the Step I response to allow the Court to review the substance of his grievance or the basis for the rejection. That is, if Plaintiff simply indicated that he sought a transfer from MCF but did not indicate that his placement at MCF was creating a substantial risk of harm, he would not have properly exhausted his failure-to-protect claim. Regardless, it is undisputed that Plaintiff did not exhaust that grievance through Steps II and III, even though the process was available to him.

Accordingly, because it is undisputed that Plaintiff failed to exhaust his failure-to-protect claims against Defendants Berghuis, Burt, Haynie, and Scott, and his retaliation claim against Defendant Davids based on Plaintiff's second placement in protective custody at IBC, I recommend that these claims be dismissed without prejudice.

### B. Retaliation

Plaintiff alleges that, after his transfer from MCF to IBC, Defendant Davids retaliated against him by placing him in protective custody, which Plaintiff compares to punitive

administrative segregation. As mentioned above, Plaintiff alleges that his initial placement in the SHU, shortly after his arrival to IBC, and his return to the SHU after his history as an informant became widely publicized by a local television station in July 2017, were retaliatory acts. Because Plaintiff failed to exhaust his administrative remedies with regard to his second placement in the SHU, the Court limits its consideration of the retaliation claim to Plaintiff's initial placement in the SHU.

The requirements for a valid First Amendment retaliation claim are well established. In order to state a First Amendment retaliation claim, a plaintiff must establish that: (1) he engaged in protected conduct; (2) the defendant took an adverse action against him "that would deter a person of ordinary firmness from continuing to engage in that conduct;" and (3) the adverse action was taken (at least in part) because of the protected conduct. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). In addition, a plaintiff must be able to prove that the protected conduct was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

The first issue is whether Plaintiff had engaged in protected conduct prior to being placed in the SHU when he arrived at IBC. Plaintiff does not directly address this point but notes that Defendant Davids does not contest that "providing information to law enforcement, testifying against a cellmate, [and] cooperating in law enforcement investigations" constitutes First Amendment protected activity. (ECF No. 116 at PageID.517 n.3.) For purposes of the instant motion, the Court accepts that the First Amendment protects at least some of the activity Plaintiff cites. Defendant Davids did raise an issue regarding protected conduct, correctly pointing out that Plaintiff "was not engaged in protected conduct when he arrived at IBC." (ECF No. 115 at 238–

13

39.) However, because that argument is more germane to whether a causal connection exists, the Court considers it as part of the third element.

Next, Plaintiff must establish that Davids subjected him to an adverse action. An action is adverse if it would deter a person of ordinary firmness from engaging in protected conduct. *See Thaddeus-X*, 175 F.3d at 394. The Sixth Circuit has noted that "actions that result in more restrictions and fewer privileges for prisoners are considered adverse." *Hill v. Lapin*, 630 F.3d 468, 474 (6th Cir. 2010). As such, placing a prisoner in administrative segregation may constitute an adverse action. *Id.* at 469; *see also Herron v. Harrison*, 203 F.3d 410, 416 (6th Cir. 2000) (holding that placing a prisoner in administrative segregation for five days could be sufficiently adverse to constitute adverse action). In contrast to administrative segregation, prisoners are placed in the SHU for protection rather than punishment. (ECF No. 115-14 at PageID.469; EF No. 115-15.) And because Plaintiff had sought a transfer to safer housing, it is arguable that his placement in the SHU was not adverse action. Nonetheless, because an SHU placement necessarily involves more limitations on a prisoner's freedom of movement, prisoners placed in the SHU have fewer privileges and greater restrictions than prisoners housed in the general population. (ECF No. 115-14 at PageID.471–72 (Davids testifying that prisoners in the SHU have more in-cell time and less yard time and access to school programs than general population prisoners).) Thus, for purposes of this case, placement in the SHU is sufficiently adverse to support a retaliation claim.

The final element is a causal connection between Plaintiff's protected conduct and the adverse action. This is where Plaintiff's claim fails. To establish this element, a plaintiff must present more than "conclusory allegations of retaliatory motive 'unsupported by material facts.'" *Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005) (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1538–39 (6th Cir. 1987)). "Motive is often very difficult to prove with direct evidence in

14

retaliation cases. Circumstantial evidence may therefore acceptably be the only means of establishing the connection between a defendant's actions and the plaintiff's protected conduct." *King v. Zamiara*, 680 F.3d 686, 695 (6th Cir. 2012). Such evidence "can include the disparate treatment of similarly situated individuals or the temporal proximity between the prisoner's protected conduct and the official's adverse action." *Hill*, 630 F.3d at 475–76.

Here, temporal proximity cannot possibly support a causal connection. The proffered protected conduct—Plaintiff's cooperation with law enforcement in the prosecution of his cellmate—occurred many years before Plaintiff was transferred to IBC. In contrast, Davids had a legitimate, nonretaliatory reason to place Plaintiff in the SHU: Plaintiff had been assaulted twice in the last three months, and MDOC officials had determined that Plaintiff had a hit out on him, meaning that he remained at risk of serious injury or death wherever the MDOC housed him. Davids testified that, because of the recent assaults, IBC staff "felt it very important to get [Plaintiff] out of general population to ensure his safety." (ECF No. 115-14 at PageID.476.) Plaintiff notes, however, that Davids also testified that Plaintiff's prior cooperation with law enforcement also factored into his decision not to release Plaintiff into the general population, suggesting that this shows retaliatory motive. While it is true that Davids said that he also considered Plaintiff's informant activity, the peculiar facts of this case show that Plaintiff's protected conduct—his informant history—was inextricably bound up with the need to place Plaintiff in protective custody. Plaintiff's protected conduct put him at risk of harm, was the reason for the assaults and created a security concern for Davids. Davids could not consider Plaintiff's need for protection without also considering that his protected conduct created that need. Thus, Davids's consideration of Plaintiff's protected conduct is not evidence of retaliatory motive.

Plaintiff argues that, even in the SHU, he was around level IV and level V gang members, suggesting that Davids's alleged concern for Plaintiff's safety was merely pretext for a retaliatory intent. While Davids testified that level V prisoners would not have been housed in the SHU, he confirmed that level IV prisoners would be housed there, but only if they did not have recent assaultive history. (*Id.* at PageID.471.) Even so, it is undisputed that Plaintiff was assaulted both times while housed in the level II general population at LRF and MCF, and the SHU at IBC was specially designated housing to ensure a safe environment for prisoners such as Plaintiff, who required protective custody. While that setting might not have eliminated all risk of harm, it provided a legitimate alternative to a placement that had previously proved unworkable for ensuring Plaintiff's security.

Finally, Plaintiff contends that Davids had alternative placement options, such as transferring Plaintiff to C-Unit, a level I facility where elderly and infirm inmates reside. Even if such a transfer were possible, in the absence of evidence that Davids transferred similarly situated prisoners to C-Unit or similar facilities and who had not engaged in protected conduct, *see Thaddeus-X*, 175 F.3d at 399, such evidence does not support an inference of retaliation.

Accordingly, I recommend that the Court grant Defendant Davids summary judgment on the merits of the exhausted portion of Plaintiff's retaliation claim.

### IV.   Conclusion

For the foregoing reasons, I recommend that Defendants' Motion for Summary Judgment (ECF No. 114) be **granted**: (1) dismissing **without prejudice** Plaintiff's Eighth Amendment claims against Defendants Berghuis, Burt, Haynie, and Scott and Plaintiff's First Amendment retaliation claim against Defendant Davids based on Plaintiff's second placement in the SHU at IBC for failure to exhaust administrative remedies; and (2) dismissing **with prejudice** Plaintiff's

First Amendment retaliation claim against Davids based on Plaintiff's first placement in the SHU at IBC. I further recommend that the case be **terminated**.

## NOTICE

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Dated: December 21, 2020    /s/ Sally J. Berens
SALLY J. BERENS
U.S. Magistrate Judge